UNITED STATES of America,
Plaintiff–Appellee,

v.

Victor JOHNSON, Michael Joiner, and
Melvin Buford, Defendants–Appellants.

Nos. 89–1234, 89–1260 and 89–1274.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 29, 1989.

Decided May 29, 1990.

As Amended June 4, 1990.

Thomas M. Durkin and Caryn Jacobs, Asst. U.S. Attys., Office of the U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Lewis Myers, Jr., Childs, Myers & Willis, Thomas J. Piskorski, Seyfarth, Shaw, Fairweather & Geraldson, Marianne Richardson, Stall & Girardi, and Mary Stowell, Leng, Stowell & Friedman, Chicago, Ill., for defendants-appellants.

Before BAUER, Chief Judge, WOOD, Jr., Circuit Judge, and FAIRCHILD, Senior Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

The defendants Victor Johnson, Michael Joiner, and Melvin Buford were charged in an indictment returned on June 16, 1988, with intimidating a witness in violation of 18 U.S.C. § 1512(b) (Count II), retaliating against a witness in violation of 18 U.S.C. § 1513 (Count III), using a firearm in commission of a felony in violation of 18 U.S.C. § 924(c) (Count IV), and conspiring to commit these offenses in violation of 18 U.S.C. § 371 (Count I). After a jury trial the defendants were convicted of all four counts, and each was sentenced to twenty-years imprisonment.[1]

On appeal, the defendants argue (1) that the evidence was insufficient to show that they had the necessary intent to commit the crimes charged; (2) the district court abused its discretion when it relied on improper factors at sentencing and when it imposed excessive sentences; and (3) the district court violated FED.R.CRIM.P. 32(c)(3)(D) in imposing the defendants' sentences. We affirm.

## I. FACTUAL BACKGROUND

As Thelma Tetter returned from work to her home in a Chicago public housing project on October 12, 1987, at her usual time, a masked man approached from behind a building and began shooting at her legs. Deliberately keeping his aim low, he fired five shots, hitting her once in the left calf. Screaming, Tetter dropped her Bible and her purse containing over $200. She was not pursued or further attacked as she ran to the next-door home of Loretta DeJean and Nicole Clark, where she called the police. Later that night, Tetter recovered both items from where she had dropped them. No money had been taken from the purse.

DeJean and Clark had seen the defendants outside their building with a gun just before the shooting. Both women knew that the defendants were members of the El Rukns, a highly organized street gang that engaged in criminal activity. Clark also knew the defendants each held the

---

1. The defendants each received five-years imprisonment for Count I, ten-years imprisonment on Counts II and III; concurrent with each other but consecutive to the term of imprisonment on Count I, and five-years imprisonment on Count IV; consecutive to the terms of imprisonment on Counts I, II, and III.

rank of "ambassador" in the organization.[2] The housing project where they lived was located in El Rukn territory, and DeJean and Clark had seen the defendants around the neighborhood on other occasions.

It was the prosecution's theory that the shooting occurred because of Tetter's relationship to Anthony Sumner. Tetter is the mother of Sumner, a former El Rukn member. Sumner had been cooperating since May 1985 with enforcement authorities in their investigations of the El Rukn organization. An "officer" in the organization, Sumner was the first of his rank to cooperate, and his cooperation was widely publicized. He pleaded guilty to certain federal crimes and was sentenced in Chicago. Sumner's guilty pleas as well as the sentencing proceedings, where his cooperation with state and federal authorities was related to the court, were matters of public record. In addition, there was media coverage of his sentencing.

Sumner provided information that was used in arrest warrants in Illinois state court and for federal wiretaps in Illinois and Texas. Sumner also testified for the prosecution in Chicago at trials of various El Rukn members. Other El Rukn members were present in the audience at these trials. In addition, information Sumner provided to a federal grand jury in Chicago resulted in an indictment against Jeff Fort, the leader of the El Rukns, and six other high-ranking members of the organization. Between October 1986 and the time of trial, discovery materials, specifically applications for wiretaps of El Rukn members and supporting affidavits, were disclosed to defense lawyers. These materials contained Sumner's name and outlined his role in providing information to federal authorities. The prosecution planned to call Sumner as a witness in the trial of Fort and the other El Rukns.

There was a short period when Sumner resumed contact with the El Rukn organization out of fear for his wife and children. Because he believed that his family was still in danger even when he was not cooperating, he began to cooperate again with federal and state authorities.

When Tetter was shot, Sumner was in protective custody, and Tetter was able to contact him only through a third party. Fort's federal trial had been going on for about six days.

## II.  ANALYSIS

### A.  *Sufficiency of the Evidence*

The defendants contend that the evidence adduced at trial was insufficient to support a conviction on any of the four counts in the indictment. The standard of review used to determine whether a jury verdict is supported by sufficient evidence is clearly established. The reviewing court is to consider all the evidence in the light most favorable to the government and must affirm the defendants' convictions if the court finds that "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Troop*, 890 F.2d 1393, 1397 (7th Cir.1989) (citations omitted). Recognizing that the defendants bear a heavy burden to overturn their convictions on appeal, we consider their arguments regarding each of the charges in turn.

#### 1.  Intimidation of and Retaliation Against a Witness

The defendants challenge the sufficiency of the evidence to support their convictions for witness intimidation in violation of 18 U.S.C. § 1512(b)[3] and retaliation against a witness in violation of 18 U.S.C.

---

**2.**  Jeff Fort was the leader of the El Rukn organization. Below Fort, there were between fifteen and twenty-five generals or "emirs." "Officer-muftis" were below the generals; below the officer-muftis were "ambassadors."

**3.**  Section 1512(b) provides:
Whoever knowingly uses intimidation or physical force, threatens, or corruptly per-

suades another person, or attempts to do so ..., with intent to—
(1) influence, delay, or prevent the testimony of any person in an official proceeding;
(2) cause or induce any person to—
(A) withhold testimony....
shall be fined not more than $250,000 or imprisoned not more than ten years, or both.

§ 1513(a).[4] To prove witness intimidation, the government must show (1) the defendants knowingly used intimidation, physical force, or threats against Tetter (2) with the intent to influence and prevent Sumner from testifying in an official proceeding and to cause Sumner to withhold testimony in an official proceeding. *See* 18 U.S.C. § 1512(b)(1)–(b)(2)(A). Similarly, to prove that the defendants retaliated against a witness, the government must show that (1) the defendants caused bodily harm to Tetter (2) with the intent to retaliate against Sumner for attending and giving testimony in an official proceeding or for giving information to law enforcement officers relating to the commission of federal offenses. *See* 18 U.S.C. § 1513(a).

The defendants do not contend that the government failed to show that they used physical force against Tetter, in violation of section 1512(b), or that they caused Tetter to suffer bodily harm, in violation of section 1513(a). Instead, the defendants' challenge focuses on the second or intent element of these crimes. They argue that the evidence adduced at trial was insufficient to prove that they intended to influence or prevent Sumner from testifying against Fort and other El Rukns. The defendants also argue that there was insufficient evidence to show that they intended to retaliate against Sumner for testifying in a grand jury proceeding or for giving information to law enforcement officers. Specifically, the defendants contend the government failed to demonstrate the necessary intent because the government did not show that they knew who Sumner was, that Tetter was Sumner's mother, or that Sumner was an informant for purposes of section 1512(b) or a federal witness for purposes of section 1513(a). We disagree.

Although it is difficult to find direct evidence in the record of the defendants' intent to intimidate and retaliate against Sumner, direct evidence of intent is usually unavailable. *See United States v. Moya–Gomez*, 860 F.2d 706, 759 (7th Cir.1988). In general, it is necessary to prove intent through circumstantial evidence, *id.; United States v. Maggitt*, 784 F.2d 590, 593 (5th Cir.1986), and a jury may thus rely on evidence of this nature to find that a defendant had the requisite intent to commit the crime charged. *United States v. Guzzino*, 810 F.2d 687, 696 (7th Cir.), *cert. denied*, 481 U.S. 1030, 107 S.Ct. 1957, 95 L.Ed.2d 529 (1987); *United States v. Cogwell*, 486 F.2d 823, 828 (7th Cir.1973), *cert. denied*, 416 U.S. 959, 94 S.Ct. 1975, 40 L.Ed.2d 310 (1974). Circumstantial evidence, moreover, is no less probative than direct evidence. *United States v. DeCorte*, 851 F.2d 948, 954 (7th Cir.1988); *United States v. Marquardt*, 786 F.2d 771, 780 (7th Cir.1986).

In reviewing the sufficiency of the evidence in cases where the government's proof has been largely circumstantial, we have said: "[W]hile it is important that we not permit a verdict based solely on the piling of inference upon inference, it is also imperative that we not rend the fabric of evidence and examine each shred in isolation...." *Moya–Gomez*, 860 F.2d at 759 (quoting *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir.1983) (citations omitted)). Practically speaking, a reviewing court must " 'use its experience with people and events [in determining] that the evidence correctly points to guilt [to guard] against the possibility' " of mistakenly affirming a guilty verdict based only on an " 'innocent or ambiguous inference.' " *Guzzino*, 810 F.2d at 697 (quoting *Redwine*, 715 F.2d at 319).

In determining whether the evidence proves guilt beyond a reasonable doubt, juries as well must use experience and may rely on ordinary common sense. *Id.* at 697. Common sense, while not a substitute for

---

**4.** Section 1513(a) provides:

Whoever knowingly engages in any conduct and thereby causes bodily injury to another person ..., with intent to retaliate against any person for—

(1) the attendance of a witness or party at an official proceeding, or any testimony given ... by a witness in an official proceeding; or

(2) any information relating to the commission or possible commission of a Federal offense ... given by a person to a law enforcement officer;

or attempts to do so, shall be fined not more than $250,000 or imprisoned not more than ten years, or both.

evidence, should be used to evaluate what it is reasonable to infer from circumstantial evidence. *Troop,* 890 F.2d at 1397; *United States v. Grier,* 866 F.2d 908, 923 (7th Cir.1989); *Guzzino,* 810 F.2d at 697.

Applying these principles to the present case, we are satisfied that a jury could reasonably conclude that the defendants intended to intimidate and retaliate against Sumner in violation of sections 1512(b) and 1513(a) by shooting at and wounding Tetter. As we have mentioned, the evidence presented at trial showed that Sumner had been a former officer of the El Rukn organization. His cooperation received wide publicity because of his high rank in the organization. In 1986, he was a government witness in two El Rukn trials. Sumner also provided information to a federal grand jury in Chicago that led to an indictment of Fort and other high-ranking El Rukns. From the time that Fort and these high-ranking El Rukns were indicted in October 1986 to their trial in October 1987, defense attorneys were fully informed through discovery materials of Sumner's testimony and cooperation in proceedings against the El Rukn organization. The prosecution planned to call Sumner as a witness in this trial. At the time Tetter was shot, Fort's federal trial had been going on for about five days.[5]

There was also evidence that during 1985 and 1986 Fort, who was not then in Chicago, had daily telephone contact with the El Rukn leadership there. The leadership reported to and received orders from Fort via telephone during this period. High-ranking members of the El Rukns met at the organization's headquarters for conference calls with Fort. Other El Rukn members also attended special meetings at headquarters.

Additionally, the record shows that the housing project where Tetter lived was in El Rukn territory and that the defendants had been seen in the neighborhood on prior occasions. DeJean and Clark, next-door neighbors of Tetter's, knew the defendants were El Rukn members, and Clark even knew their El Rukn ranks.

Finally, the evidence adduced at trial regarding the circumstances of the shooting also supports the jury's verdict that the defendants were guilty beyond a reasonable doubt of witness intimidation and retaliation against a witness. The shots were aimed at Tetter's legs, rather than at more vulnerable parts of her body. After the shots were fired, she was not chased or otherwise assaulted and no money was taken from the purse she dropped, although the purse contained more than $200. No other motive for the assault has been suggested.

After reviewing the evidence in a light most favorable to the government, we conclude that a jury rationally could have determined that the defendants' intent in shooting Tetter was to intimidate and retaliate against Sumner in violation of sections 1512(b) and 1513(a). Contrary to the defendants' assertion, this is not a situation where the jury verdict is based only "on the piling of inference upon inference," *Moya–Gomez,* 860 F.2d at 759.[6] Although the government presented no direct evidence that the defendants knew who Sumner was, Sumner's relationship to Tetter, or Sumner's role as an informant and federal witness, the evidence showed that all this information was widely known. Furthermore, there was evidence that the El Rukn

---

**5.** Sumner ultimately did not testify at trial. The record reflects that the decision not to call him as a witness was based on prosecutorial discretion. Section 1512(b), however, does not require that the witness in fact be intimidated into not testifying—the focus is on the endeavor to bring about the proscribed result, rather than on the success of the endeavor. *Maggitt,* 784 F.2d at 593; *United States v. De Stefano,* 476 F.2d 324, 330 (7th Cir.1973).

**6.** At oral argument, defense counsel observed that the defendants were not very good at either retaliation or intimidation because the shooting occurred after Sumner had been cooperating for over two years with authorities and after Fort's trial had already begun. But neither section 1512(b) nor 1513(a) requires that a defendant's endeavor be successful, and we find unpersuasive defense counsel's contention that the timing of the assault during the progress of the trial is indicative of the defendants' lack of intent.

organization was aware of Sumner's identity and roles as well as specific testimony linking the defendants to the organization. Based on this and other circumstantial evidence, such as the nature of the defendants' attack on Tetter, a reasonable jury clearly could have found, and did find, that the defendants had the requisite intent to commit the crimes of witness intimidation and retaliation against a witness. We therefore conclude that the defendants' challenges to their convictions under sections 1512(b) and 1513(a) are without merit.

2. The Conspiracy and Firearms Charges

■■■■ The defendants also contend that their convictions for conspiring to intimidate and retaliate against a witness and for using a firearm while intimidating and retaliating against a witness are not supported by sufficient evidence. The defendants argue that because the evidence was insufficient to convict them of witness intimidation and retaliation against a witness, their convictions for conspiring to commit and using a firearm while committing these felonies cannot stand. This is the defendants' sole argument. Because we have already concluded that the evidence is sufficient to support their convictions for committing the underlying felonies of intimidating and retaliating against a witness, the defendants' challenges to their conspiracy and firearms convictions must necessarily fail.

B. *The Defendants' Sentences*

The defendants, each of whom received a twenty-year sentence out of a possible thirty-year sentence, *see supra* note 1, raise various challenges to their sentences.

■■■■ We begin by observing that this pre-Guidelines case is governed by principles traditionally applied in the review of sentences. Sentencing courts have wide discretion in determining what sentences to impose. *United States v. Tucker*, 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592

(1972); *United States v. George*, 891 F.2d 140, 143 (7th Cir.1989). Our review of sentences imposed by the district court is therefore limited. *George*, 891 F.2d at 143; *United States v. Nowicki*, 870 F.2d 405, 406 (7th Cir.1989); *United States v. Perez*, 858 F.2d 1272, 1274 (7th Cir.1988). Sentences falling within the statutory limits can only be reversed for a failure to exercise discretion or for reliance on improper or unreliable information. *United States v. Monzon*, 869 F.2d 338, 346 (7th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 2087, 104 L.Ed.2d 650 (1989); *United States v. Ford*, 840 F.2d 460, 466 (7th Cir.1988); *United States v. Sato*, 814 F.2d 449, 452 (7th Cir.), *cert. denied*, 484 U.S. 928, 108 S.Ct. 294, 98 L.Ed.2d 254 (1987). Furthermore, the sentencing court may rely on information that would not be admissible at trial. 18 U.S.C. § 3661 (formerly 18 U.S.C. § 3577) states: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *See also United States v. Chaverra–Cardona*, 879 F.2d 1551, 1556 (7th Cir.1989). Keeping in mind the defendants' heavy burden, we consider each of their arguments in turn.

1. Reliance on Improper Factors

■■■■ The defendants first argue that the district court violated their fifth amendment right against self-incrimination. Specifically, the defendants contend that because they did not speak on their own behalf at the sentencing hearing,[7] the district court used their right to remain silent against them by relying on their lack of remorse in imposing their sentences.

During the sentencing proceeding, the district court stated:

I am also struck by the fact that none of the defendants have owned up to their crime, not that they have any obligation to do so, but there is no indication on

---

7. At the sentencing hearing, each defendant declined to say anything on his own behalf. Neither Johnson nor Buford had submitted a state-ment to the probation officer concerning the offenses; Joiner had submitted a statement in which he affirmatively denied guilt.

their part that they recognize that this was a horrendous crime or that they are even sorry for what they did. So, I do not in my heart find a great deal as far as mitigation is concerned.

(Sentencing Tr. at 43).

The due process clause of the fifth amendment prohibits a court from punishing a defendant for exercising a constitutional right, *United States v. Long*, 823 F.2d 1209, 1211 (7th Cir.1987); *see also Bordenkircher v. Hayes*, 434 U.S. 357, 363, 98 S.Ct. 663, 667, 54 L.Ed.2d 604 (1978). There is a distinction, however, between punishing a defendant for exercising his right to remain silent and considering the defendant's character in determining an appropriate sentence. *United States v. Bangert*, 645 F.2d 1297, 1309 (8th Cir.), *cert. denied*, 454 U.S. 860, 102 S.Ct. 314, 70 L.Ed.2d 158 (1981); *United States v. Allen*, 596 F.2d 227, 231 (7th Cir.), *cert. denied*, 444 U.S. 871, 100 S.Ct. 149, 62 L.Ed.2d 97 (1979); *United States v. Miller*, 589 F.2d 1117, 1138 (1st Cir.1978), *cert. denied*, 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979). We disagree with the defendants' claim that these remarks evince an intent on the part of the court to punish them for their silence.

It is well established that a sentencing judge may consider lack of remorse when imposing a sentence. *Nowicki*, 870 F.2d at 407 (trial judge may consider defendant's refusal to recognize offense); *Perez*, 858 F.2d at 1276 (sentencing judge may consider whether defendant is contrite); *Ford*, 840 F.2d at 467 (trial judge can consider defendant's refusal to recognize offense at sentencing hearing); *Sato*, 814 F.2d at 452 (there is no doubt that sentencing judge may consider whether defendant is contrite); *Marquardt*, 786 F.2d at 782 (defendant's refusal to recognize offense is relevant factor in sentencing). We recognize that it may sometimes be difficult to distin-

guish between punishing a defendant for remaining silent and considering a defendant's failure to show remorse. Nevertheless, we are convinced that the defendants in the present case were not penalized for exercising their fifth amendment right against self-incrimination. There were other reasons sufficient to justify the sentences.

The record shows that at the sentencing hearing, none of the defendants asserted his right to remain silent. Joiner had denied his guilt in his version of the offense in the presentence report. Neither Johnson's nor Buford's report contained a defendant's version of the offense. While Buford's attorney did inform the probation officer that his client's version of the offense would not be forthcoming because the case was on appeal, Buford did not assert the privilege at the hearing.[8]

At the sentencing hearing, the district court stated that it was considering rehabilitation, punishment, and general deterrence. It is evident from the record that the court considered a range of factors in seeking to balance these interests. The court emphasized the type of crimes that the defendants had committed, finding that such crimes struck at the very heart of our system of justice. The court also looked at the defendants' ages, employment records, and criminal histories, all of which are factors "concerning the background, character, and conduct of a person convicted of an offense" that section 3661 authorizes a sentencing court to consider.

Additionally, while expressing its discomfort with the defendants' failure to acknowledge their crimes, the district court at the same time explicitly recognized the defendants' right not to do so. At most, the court's comments indicate that showing remorse could be a possible mitigating factor in sentencing, which is not an improper view. *See United States v. Thomp-*

---

**8.** *United States v. Safirstein*, 827 F.2d 1380 (9th Cir.1988), a case upon which the defendants heavily rely, is therefore inapposite. In *Safirstein*, the defendant's failure to cooperate reflected his counsel's advice to assert his fifth amendment privilege against self-incrimination. Counsel for defendant stated: "[M]y client has a

Fifth Amendment right.... Now that he finds himself convicted, as his attorney I have advised him not to discuss the details of this case because it is my opinion that discussing the details of this case can in fact impact adversely on his appeal...." *Id.* at 1388.

*son,* 476 F.2d 1196, 1201 (7th Cir.), *cert. denied,* 414 U.S. 918, 94 S.Ct. 214, 38 L.Ed.2d 154 (1973) ("A show of lenience to those who exhibit contrition by admitting guilt does not carry a corollary that the Judge indulges in a policy of penalizing those who elect to stand trial.").

It is clear that the district court considered a wide range of permissible factors when determining what sentences to impose—sentences that we note were well below the statutory maximum. We therefore conclude that no violation of the defendants' right against self-incrimination occurred at the sentencing hearing.

■ The defendants also argue that the district court violated their fifth amendment due process right to be sentenced fairly on the basis of accurate information. Specifically, the defendants contend that the court improperly considered the defendants' admitted membership in the El Rukn organization as well as information included in the presentence report pertaining to the shooting by other El Rukns of the relatives of Trammel Davis. The defendants' sole support for their due process argument is the following statement made by the district court at the sentencing hearing:

> I have been asked not to judge on the history of the El Rukns but that permeates this entire case because these gentlemen, in committing the crimes that they did, were operating as members of the El Rukns, under the discipline of the El Rukns.

(Sentencing Tr. at 35). Read in its entirety, however, the record of the hearing reveals that no due process violation occurred.

We have already determined that the district court looked to a number of permissible factors when sentencing the defendants. *See supra* Part II.B.1. To the extent that the district court might have considered the defendants' gang membership, such consideration was not improper.

Gang membership, insofar as it bears on the issues of rehabilitation and general deterrence, may be a relevant factor in fashioning an appropriate sentence. Moreover, the record shows that the defendants, who were El Rukns, carried out the attack on Tetter at the direction of the El Rukn organization.[9] Given the relevance of gang membership to the possibility of rehabilitation and the need for general deterrence as well as to the facts of this case, we cannot conclude that the district court's consideration of the defendants' El Rukn membership was improper.

We similarly find the defendants' claim that they were sentenced for alleged unrelated activities of gang members to be without merit. While the government's version of the offense described other recent acts of witness intimidation and retaliation committed by unidentified El Rukn members, there is no evidence in the record that the court relied on this information in sentencing the defendants. Rather, the record demonstrates that the court viewed this information as background only.[10] We therefore conclude that the district court did not sentence the defendants for crimes they did not commit in violation of their due process rights.

**2. Excessive Sentences**

■ The defendants next contend that the district court abused its discretion by imposing excessive sentences. To support this claim, the defendants argue that they should have received lesser sentences because two of them, Buford and Joiner, had no prior felony convictions and because the injury to Tetter was only slight. Again, we are unpersuaded.

Sentencing judges are authorized to decide what weight mitigating and aggravating factors should receive. *George,* 891 F.2d at 143; *Marquardt,* 786 F.2d at 781. The record shows that the district court considered the defendants' prior criminal histories and found that none of the defen-

---

9. Perhaps most notably Johnson, upon his arrest, stated that he owed his allegiance to "Chief Malik," the El Rukn name used by Jeff Fort.

10. The court stated, "I think the particular paragraph that is objected to, while certainly not in any way implicating the defendant, is part of the background in which this particular instance occurred." (Sentencing Tr. at 9).

dants' records was unblemished. Additionally, the district court found that the attack on an innocent woman to prevent a witness from testifying was a "horrendous" crime and that attack was carried out at the direction of the El Rukns. Because a reviewing court "will not question the relative importance placed on one factor over another" where the district court has considered the mitigating factors raised by a defendant, *Perez*, 858 F.2d at 1276 (citation omitted), this argument of the defendants must fail.

■■■ The defendants also contend that their sentences were excessive because under the Sentencing Guidelines, their sentences would have been less than one-half of those that they actually received. The defendants, however, committed these crimes in October 1987 and the Guidelines do not apply to offenses occurring before November 1, 1987, *George*, 891 F.2d at 143 & n. 6—a point that the defendants do not dispute. We have already concluded that the district court properly considered the evidence before it when determining what sentences to impose. It is irrelevant that had this been a Guidelines case, the defendants might have received lighter sentences.

We therefore conclude that the district court did not abuse its discretion when it sentenced each of the defendants to a term of twenty-years imprisonment.

### 3. FED.R.CRIM.P. 32(c)(3)(D)

■■■ Finally, the defendants argue that the district court violated rule 32(c)(3)(D) when imposing their sentences.[11] Rule 32(c)(3)(D), which protects a defendant's due process right to a fair sentence, requires the trial court to make written findings as to all challenges to the factual accuracy of the presentence report or a written determination that the disputed information will not be relied on in sentencing. *United States v. Stout*, 882 F.2d 270, 272 (7th Cir.1989); *United States v.*

*Brown*, 870 F.2d 1354, 1361 (7th Cir.1989); *Perez*, 858 F.2d at 1276. According to the defendants, the court was thus required either to make a "finding" regarding allegations in the government's version of the offense pertaining to acts of witness intimidation and retaliation committed by other El Rukns or to state that it was not relying on this information in sentencing.

Rule 32(c)(3)(D) is triggered by allegations of factual inaccuracies in the presentence report. *Perez*, 858 F.2d at 1276; *Brown*, 785 F.2d at 591–92; *United States v. Eschweiler*, 782 F.2d 1385, 1388 (7th Cir.1986). The defendants' challenge, however, is not of this nature. The defendants objected at the hearing to the inclusion of information relating to these other shootings on grounds that since the other shootings were not the subject of the indictment and did not come up at trial, the information was superfluous and prejudicial. (Sentencing Tr. at 5). On appeal, the defendants claim that the district court relied on this information to impose excessive sentences. It is thus clear that the defendants' dispute does not pertain to any factual inaccuracy but goes to what the defendants claim is the improper use of this information in sentencing. This is essentially their unsuccessful due process argument, *see supra* Part II.B.1., recast as an alleged rule 32(c)(3)(D) violation. Because the defendants' allegations do not constitute the type of challenge that brings the rule into play, *see, e.g., United States v. Jones*, 856 F.2d 146, 148–49 (11th Cir.1988), we must conclude that no rule 32(c)(3)(D) violation occurred.

### III. CONCLUSION

For the foregoing reasons, the defendants' convictions and sentences are hereby affirmed.

---

**11.** FED.R.CRIM.P 32(c)(3)(D) provides:

If the comments of the defendant and the defendant's counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investigative report or the summary of the report or

part thereof, the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing. . . .